UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOTOR WERKS PARTNERS, LP, <br><br> Plaintiff, <br><br> v. <br><br> GENERAL MOTORS LLC, <br><br> Defendant. | No. 14 CV 0119 <br><br> Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Motor Werks and defendant General Motors are parties to a dealership agreement that governs the sale and service of Cadillac cars. When GM denied Motor Werks's request to relocate its Cadillac dealership, Motor Werks brought this action against GM under the Illinois Motor Vehicle Franchise Act. Motor Werks moves for summary judgment on Counts I and II of its first amended complaint. Count I seeks damages under the IMVFA and Count II seeks a declaration that GM violated the IMVFA. For the following reasons, Motor Werks's motion is denied.

**I.   Background**

GM manufactures new motor vehicles and distributes its vehicles through a network of dealers. [146-3] at 2, ¶ 2.[1] GM authorizes dealers to sell GM's products

---

[1] The facts are largely taken from GM's response to Motor Werks's Local Rule 56.1 statement of material facts, [146-1], and Motor Werks's response to GM's Local Rule 56.1 statement of additional material facts, [148-1]. Unless otherwise noted, the facts related below are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by the local rule. Bracketed numbers refer to entries on the district court docket. Any document previously filed under seal and

and services using GM's trademarks through a Dealer Sales and Service Agreement. [146-3] at 2, ¶ 2. Through this agreement, GM seeks to protect its control over the use of its trademarks, including the way that its trademarks, such as Cadillac, are used at GM dealerships. [146-3] at 5, ¶¶ 11–12.

Motor Werks has been a Cadillac dealer for GM since 1989. [146-1] ¶ 1. For at least the first nine years of its dealership business, Motor Werks operated its Cadillac dealership from an auto mall on South Barrington Road, in Barrington, Illinois.[2] *Id.* In 2000, GM authorized Motor Werks to relocate its Cadillac dealership to a property on Cook Street in Barrington, where Motor Werks would also begin operating an Oldsmobile dealership for GM.[3] *Id.*; [142-4] 13:13–24. Throughout their business relationship, Motor Werks and GM have been parties to several contracts.[4]

Motor Werks and GM executed a Dealer Sales and Service Agreement on June 29, 2012. [146-3] at 10. It states:

---

referenced in this opinion shall be unsealed; by March 29, 2017, the parties shall file a joint statement identifying the docket entries for unsealing or stating a basis for continued secrecy. *See Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002) ("In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is entitled to be kept secret on appeal.").

[2] The auto mall on South Barrington Road opened in 1987. [146-2] at 5:18. During at least its first few years of operation, it housed Mercedez-Benz, BMW, Cadillac, Honda, and Suzuki dealerships. [146-2] at 5:19. Infiniti and Saab dealerships were added within five years of the auto mall's opening. [146-2] at 5:20–21.

[3] Oldsmobile is another one of GM's line-makes. [146-3] at 2, ¶ 3.

[4] The parties have only agreed to one contract labeled "exclusive use agreement" and that was the "Exclusive Use Agreement and Option to Purchase Assets" dated September 2, 1999. [146-1] ¶ 18; *see* [142-4] at 22–40. That agreement was amended, restated, and executed on April 11, 2001. [142-4] at 41–52.

> If Dealer wants to make any change in the location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors [sic] evaluation and final decision in light of dealer network planning considerations. No change in location or in the use of Premises, including addition of any other vehicle lines, will be made without General Motors [sic] prior written authorization pursuant to its business judgment.[5]

Earlier, in a Dealer Bulletin dated October 1, 2001, GM outlined its "Non-GM Dual Policy." [146-1] ¶ 3. The policy discouraged dealers from selling or servicing non-GM products at GM dealerships because GM believed that diminished sales and service performance resulted from the commingling of GM and non-GM products. [146-3] at 69. As an incentive to dealers who complied with the non-dualing policy, GM offered discretionary benefits and privileges; seven such benefits and privileges were outlined in a non-exhaustive list in the Bulletin: (1) "Dealership eligible for Dealer Network Change Assistance if available"; (2) "Dealer Operator eligible for consideration for an additional dealer point established or supported by GM"; (3) "Dealership eligible for another GM brand at its dealership if available and consistent with GM Dealer Network Plan"; (4) "Dealership eligible for facility image stipend"; (5) "Dealer Operator eligible for new Motors Holding Investment if available"; (6) "Dealer Operator eligible to participate on GM dealer advisory boards as openings occur"; (7) "Dealership and Dealer Operator eligible for GM recognition activities commencing after January 1, 2002." [146-3] at 69–70. Dealers who did not

---

[5] [146-3] at 17.

comply with the non-dualing policy were not eligible to receive these benefits or privileges. [146-3] at 70.

Representatives from Motor Werks and GM met in 2011 to discuss a potential relocation of the Cadillac dealership; GM warned that it would require compliance with its policies, including the non-dualing policy. [146-1] ¶ 5. In August 2012, Motor Werks initiated a Change Request with GM to relocate the Cadillac dealership from the Cook Street location to the auto mall on South Barrington Road.[6] [146-1] ¶¶ 8, 12. Motor Werks explained in its correspondence to GM that the auto mall was undergoing renovations that it believed would "substantially increase service capacity." [146-1] ¶ 12. Although Motor Werks had not submitted all the necessary information, GM replied to Motor Werks and explained that the auto mall violated the non-dualing policy and failed to meet GM's facility size standards, among other issues.[7] [146-1] ¶¶ 12–13; [146-3] at 6, ¶ 16. GM told Motor Werks it could relocate to the auto mall only if the Cadillac dealership was a separate standalone exclusive facility (per the non-dualing policy).[8] [142-6] 7:20–8:6. GM's disapproval of Motor Werks's proposal was only based on the preliminary information available, as GM noted: "Motor Werks has not yet supplied all the information needed to conduct a final review and assessment of Motor Werks's

---

[6] From 2000 to the filing of this motion, GM only authorized Motor Werks to operate a Cadillac dealership at the Cook Street location. [148-1] ¶ 2.

[7] The auto mall has dealerships for Mercedes-Benz, Honda, Infiniti, Porsche, and BMW on its property, [146-2] 4:4–23, and all five line-makes are serviced in one location at the auto mall. [146-2] 9:19–23.

[8] There is at least one GM dealership in the central region (the same region that Motor Werks is in) that receives Essential Brand Elements payments even though they share rooflines with a non-GM Brand. [142-5] 13:19–14:8.

proposed relocation and, as a result, GM has not yet been able to determine whether Motor Werks's proposal would comply with GM's other requirements for approval." [148-1] ¶ 29; [142-5] 8:11–21.

Motor Werks continued to meet and corresponded with GM representatives about its relocation proposal. [146-1] ¶ 12. Simultaneously, Motor Werks enrolled in the Essential Brand Elements program (one of the facility image programs GM uses to encourage dealers to comply with the non-dualing policy).[9] [146-1] ¶ 9. Through the EBE program, GM gives dealers funds at the end of each quarter if they satisfy certain requirements in the areas of digital marketing, customer sales and service retention, facility image, and training. *Id.* If the dealer fails to satisfy one of these requirements while enrolled in the EBE program, it would not receive funds at the end of that quarter. [142-5] at 27. To help administer the EBE program, GM made arrangements with Gensler, a third-party architectural firm, to assist dealers in understanding the aesthetics and specific requirements of the facility image program, and to help dealers make design decisions when building or renovating a facility so that it complies with the EBE program. [142-5] at 34.

Motor Werks obtained a consultation with Gensler for the Cook Street location. [146-1] ¶ 9. As part of the consultation, Gensler requested drawings as-built of the Cook Street location; Motor Werks had to hire an independent architect to create those drawings for Gensler. [142-4] 20:11–15. After Gensler analyzed the

---

[9] Since GM published the Bulletin in 2001, which referred to a "facility image stipend," GM has offered various "facility image" programs to its dealers; the EBE program is its current iteration. [142-9] 6:16–23.

drawings, it sent Motor Werks a report about what changes would need to be made to bring the Cook Street location into compliance with the image requirements of the EBE program. [142-4] 20:16–24. Ultimately, Motor Werks decided it would not invest in making the Cook Street location compliant.[10] [142-4] 21:4–9. Motor Werks considered what it would cost to build a standalone exclusive Cadillac dealership at a separate Motor Werks site on Grove Street. [142-4] 14:12–24. James Hub, the president of Motor Werks, estimated it would cost six million dollars to build a standalone Cadillac facility at Grove Street.[11] [142-4] 15:4–21. He did not consider the cost of a standalone exclusive Cadillac facility at the auto mall because the property does not have the physical space to accommodate another building. [142-4] 17:1–7.

From the time that Motor Werks enrolled in the EBE program in November 2012, until it fell out of compliance with the requirements in 2013, it received $879,000 in payments from GM. [146-1] ¶¶ 9–10. If Motor Werks had continued to comply with the EBE program's requirements, GM would have paid Motor Werks approximately $641,000 additional funds through September 30, 2016. [148-1] ¶ 11.

In October 2013, Motor Werks offered to enter into a Performance Agreement and/or relinquish compliance with the EBE program in order for GM to authorize relocation of the Cadillac dealership to the auto mall. [146-1] ¶ 15. GM did not agree

---

[10] Gensler's report did not contain a cost estimate for all the changes that would need to be made in order to bring the Cook Street facility into compliance with the EBE program. [142-4] 21:1–3.

[11] This estimate was not created by an independent architect or by Gensler; it was based on Hub's recent experience of paying to remodel the auto mall on South Barrington Road, a twenty-two million dollar project. [142-4] 15:4–21.

6

as it believed the proposal violated the non-dualing policy and was not in the best interest of the Cadillac brand. *Id.* Negotiations broke down and Motor Werks filed this lawsuit.

The future location of Motor Werks's Cadillac dealership remains uncertain. Even if Motor Werks were to implement GM's suggestions for how to have a standalone exclusive Cadillac facility at the auto mall, Motor Werks would have to submit a new change request reflecting the new proposal; in turn, GM would start its process of reviewing the new proposal. [142-5] 7:9–8:7. GM would have to approve key metrics with respect to Motor Werks's new proposal, including: (1) site approval; (2) various milestone commitments (e.g., deadlines for real estate, facilities plans and deadlines related to image obligations, construction deadlines, beginning operations); (3) facility image requirements (in both appearance and layouts); (4) facility requirements (including space/premises requirements related to New Vehicle Display space/stalls requirements, both interior and exterior, Used Vehicle Display space/stalls requirements, and building size requirements); (5) new working capital requirements related to the proposed operations; and (6) other material terms and conditions. [148-1] ¶ 27. The consequences of relocating Motor Werks's Cadillac dealership from the Cook Street location to the auto mall on South Barrington Road, therefore, remain hypothetical.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(c), the trial judge shall grant summary judgment only if there is no genuine issue as to any material fact and if

the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A dispute about a material fact is "genuine" if there is evidence from which a reasonable jury could reach a verdict for the nonmoving party. *Id.* at 248. The moving party bears the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The trial judge's role is not to weigh the evidence and determine the truth, but to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. All justifiable inferences are drawn in the nonmoving party's favor. *Id.* at 255.

## III. Analysis

The Illinois Motor Vehicle Franchise Act regulates the distribution and sale of motor vehicles in the state. *See* 815 ILCS 710/1.1. Its purpose is: "to prevent frauds, impositions and other abuses upon its citizens, to protect and preserve the investments and properties of the citizens of this State, and to provide adequate and sufficient service to consumers generally." *Id.* Both GM and Motor Werks are covered by the statute, as are the contracts that govern their relationship. *See* 815 ILCS 710/2–3.

Subsection (g) of the statute's "Unfair competition and practices" section states: "Notwithstanding the terms, provisions, or conditions of any agreement or waiver, it shall be deemed a violation for […] a distributor […] to directly or indirectly condition […] the approval of the relocation of an existing dealer's facility […] on the willingness of a dealer […] to enter into a site control agreement or

exclusive use agreement unless separate and reasonable consideration was offered and accepted for that agreement." *See* 815 ILCS 710/4(g). The statute defines an exclusive use agreement as an agreement that "has the effect of […] requiring that the dealer establish or maintain exclusive dealership facilities." *Id.*

Motor Werks's interpretation and application of the statute to this dispute has evolved over the course of this litigation. In its first motion for summary judgment, Motor Werks argued that GM violated § 4 of the IMVFA by failing to offer any consideration for compliance with GM's exclusivity requirement. *See* [46] at 10–11. According to Motor Werks's interpretation, the introductory phrase of § 4—"Notwithstanding the terms, provisions, or conditions of any agreement or waiver"—should be understood as a directive to disregard any preexisting agreements between the parties. *See* [46] at 12. But at the same time, Motor Werks identified GM's non-dualing policy as the source of GM's exclusivity requirement, further arguing that this policy was incorporated into the Dealer Agreement and that together, the preexisting policy and the preexisting Dealer Agreement comprised a prohibited exclusive use agreement. *Id.* at 12–13; [70] at 11. GM argued that it simply turned down a relocation request and that it never required Motor Werks to enter into any agreement as a condition of relocation. [54] at 21. Under GM's theory, § 4 did not apply to the parties' transaction. [54] at 1–2, 20–21.

Based on the first set of summary judgment briefs, I made several conclusions. First, GM's non-dualing policy was incorporated into the Dealer Agreement by its reference to GM's business judgment. *See* [95] at 5. As a result,

9

when Motor Werks renewed its agreement with GM in 2012, it necessarily agreed that its ability to relocate its Cadillac dealership was conditioned on the exclusivity of the new facility. *See* [95] at 5–6. Second, GM did not ask Motor Werks to enter into a new agreement during its relocation proposal negotiations in 2013; therefore, GM did not *directly* condition approval of the relocation on Motor Werks's willingness to enter into an exclusive use agreement. *See* [95] at 5. Nevertheless, GM *indirectly* conditioned approval of relocation on the entering into of an exclusive use agreement, through its invocation of continued compliance with the non-dual policy. *See id.*

After further discovery, Motor Werks filed a second motion for summary judgment and in this motion, it resuscitates some of its original arguments (concerning consideration and the statute's "notwithstanding" clause) and it raises a new argument that it is oddly similar to GM's original argument that the parties were not "enter[ing] into" a new agreement during relocation negotiations. *See* [54] at 20. Motor Werks now argues that the statute prohibits exclusive use agreements unless the agreement is new and specific to relocation. [148] at 6. Since GM did not offer Motor Werks a new agreement that specifically related to the relocation, Motor Werks argues GM violated the statute. [148] at 6–7. Motor Werks's reading of the statute conflates the concept of separate consideration with that of a separate agreement. In any event, even assuming for the moment that the statute *did* require a new agreement specific to relocation, the logical consequence of the absence of such an agreement would mean the statute was *not* violated, as GM's

original theory suggested, because GM was *not* conditioning relocation on Motor Werks's willingness to enter into a separate agreement.

I remain of the view that the statute, read as a whole (and favorably to the dealers in accord with the legislature's intent), prohibits a manufacturer from conditioning relocation on the continued enforcement of a preexisting agreement to exclusivity, unless that agreement's exclusivity provisions were supported by separate and reasonable consideration. The "notwithstanding" clause does not require that preexisting agreements be disregarded. That phrase simply prohibits parties from contracting around the rights and obligations contained in the statute; it makes clear that § 4 supersedes any preexisting agreement that conflicts with the statute's aims. For example, a preexisting agreement that allowed a dealer to condition the approval of a relocation request on the dealer's willingness to enter into an exclusive use agreement *without* consideration would be ignored under the statute. By contrast, the same preexisting agreement *with* consideration would have effect under § 4. The Dealer Agreement and non-dualing policy fall into the latter category and therefore, they should be considered. The undisputed record establishes that Motor Werks accepted the Dealer Agreement and the non-dualing policy. It also supports a finding that both of those agreements were supported by consideration.[12] Accordingly, GM did not violate § 4 by imposing its exclusivity

---

[12] Contrary to Motor Werks's argument, each of these agreements is supported by separate consideration—the Dealer Agreement authorizes the dealer to sell and service GM products and the Non-GM Dual Policy "agreement" offers eligibility for benefits to dealers who maintain exclusive facilities, *see* [146] at 17—and do not run afoul of Illinois's common law contract principles. Relatedly, these agreements provide for continuing rights and obligations between GM and Motor Werks so they do not violate the preexisting duty rule.

requirement as a pre-condition to approving Motor Werks's relocation proposal. Motor Werks is not entitled to judgment as a matter of law on Counts I and II.

GM presented evidence about the process Motor Werks would have to go through to submit a new relocation proposal to GM, and the various requirements Motor Werks would have to meet in order for GM to approve any relocation. There is no evidence in the record about how Motor Werks intends to proceed with respect to relocating its Cadillac dealership. As such, it is impossible to know whether GM's trademarks would be harmed and if so, in what manner or to what degree. On this record, any decision on GM's additional arguments concerning the Lanham Act and takings under the United States and Illinois constitutions would be advisory, and so I do not reach those arguments.

## IV. Conclusion

Motor Werks's motion for summary judgment on Counts I and II, [142], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: 3/14/17

---

*See Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.*, 776 F.2d 198, 208 (7th Cir. 1985).